Manuel GALLEGOS, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–01–00734–CR.

Court of Appeals of Texas,
Dallas.

May 6, 2002.

Cynthia Michelle Barbare, Robert Udashen, Sorrels & Udashen, Dallas, for Appellant.

William T. (Bill) Hill, Jr., Patricia Poppoff Noble, Asst. Dist. Atty., Dallas, for State.

Before Justices LAGARDE, BRIDGES, and FRANCIS.

## OPINION

Opinion by Justice FRANCIS.

A jury convicted Manuel Gallegos of murder and assessed punishment at fifty years in prison. In four issues, appellant complains (1) the evidence is legally and factually insufficient to support his conviction, (2) the trial court erred in failing to hold a hearing on his amended motion for new trial, and (3) the jury charge violated his due process rights. For the reasons set out below, we conclude appellant's issues have no merit and affirm the trial court's judgment.

On July 21, 2000, eighteen-year-old Alfredo "Little Freddy" Lopez was fatally shot in the back outside a West Dallas residence. The crime scene encompassed Canada Drive, Coronet Street, and Bataan Street. At trial, Lopez's friend, Jesse Hernandez, testified he and Lopez were riding bicycles at about 10:15 p.m. on Canada Drive near Bataan Street when they became involved in a confrontation with "Manuel" and his friends. (At trial, Hernandez could not identify appellant as "Manuel," although it is undisputed that appellant is the "Manuel" referred to by Hernandez.) Hernandez told Lopez to drop his bicycle and run. Appellant approached Hernandez and told him, "I don't want you. I want your friend, Freddy." Appellant pulled out a gun and shot it in the air. Hernandez ran. While running, Hernandez heard a second shot but did not know the whereabouts of Lopez. He returned to the area where the shots were fired and saw Lopez lying on the parkway between the street and sidewalk outside 3350 Bataan. Lopez had been shot once in the back; the bullet exited his left upper chest area.

Across the street, Albert Ayala was on his porch when he heard a gunshot and saw Hernandez running and then Lopez running. Ayala spotted appellant standing between a house and a tree. About the time Lopez reached a parked van, Ayala saw appellant fire a gun. Ayala saw the flash of the gun and "jumped on" the ground. When Ayala looked up, Lopez was on the ground and appellant was walking away. Ayala ran to Lopez, who was still alive but could not speak. Hernandez then arrived at the scene. Ayala said he had no doubt that appellant was the person who shot Lopez. Ayala said he was beaten up that same night by appellant's friends for "snitching" on appellant.

The police interviewed several witnesses that night and, as a result of their investigation, focused on appellant as the shooter. One of the witnesses was Jose Nunez, Jr., who told the police appellant shot Lopez, although at trial Nunez denied making that statement. Ayala did not tell the

police what he saw that night, but he did give the police the descriptions of two suspect vehicles, a Chevrolet truck and an Impala, which belonged to appellant and his brother. Police searched the truck and found a .40–caliber weapon.

As part of their investigation, police also found eighteen shell casings and live rounds at the crime scene. Of the eighteen, three spent casings were from a .40–caliber weapon. One of those casings was fired from appellant's gun; the other two were not. Also, police did handwashing tests on several witnesses to determine if they had fired a gun; only appellant's came back positive.

Several hours after the shooting, appellant gave a written statement to the police. In the statement, appellant said he, his brothers, Nunez, and two friends were sitting outside drinking beer at a house on Coronet Street when Lopez and Hernandez came by on bicycles and taunted them. Appellant, who was armed with a .40–caliber Smith and Wesson gun, told Lopez to "get the fuck out of here." When Lopez refused to leave, appellant said he shot "once in the air." Lopez ran but then stopped and "kept talking shit." Appellant again warned Lopez to leave and "shot again in the direction where [Lopez] was as he started to run between the houses." Lopez kept running. After appellant fired the shots, he and his brother got into his Chevrolet pickup truck and left. They came back to the house on Coronet and saw "a lot of guys" fighting in the front yard. Appellant fired two shots in the air, and everyone scattered. According to appellant, these shots got the attention of the police, who ultimately stopped his vehicle and arrested him. Appellant hid the gun in the arm rest in the back seat.

In his interview with police, appellant repeatedly denied that he shot Lopez. In fact, appellant said he "did not see how he could have shot him."

Nunez testified for appellant. He said Hernandez and Lopez were "cussing" at appellant and the group for no reason, and appellant fired his gun into the air. Lopez continued to taunt appellant, and appellant fired a second shot, again into the air. When appellant fired the second shot, Lopez dropped his bicycle and ran off. During the confrontation, Nunez said appellant was "mad" and he tried to calm him down: "I was telling [appellant], 'Don't do it,' you know, 'Don't scare them off.'" After appellant shot the gun twice, Nunez said he told appellant to leave, and appellant and his brother left. As appellant was leaving, Lopez's brother, Ismael, arrived. Nunez feared there would be trouble, although he said he did not know at that point Lopez had been shot. He went inside the house and told his sister to call the police. While inside, Nunez heard two gunshots from Bataan Street.

Nunez said he did not learn that Lopez had been shot until he was at the police station. He testified there was no indication that Lopez had been hit by the second shot fired by appellant. Nunez said his entire written statement to the police was accurate except for the portion that stated, "Manuel shot at Alfredo to scare them both off." At trial, Nunez insisted that appellant fired into the air both times, and not at Lopez. After hearing the evidence, the jury convicted appellant of murder. This appeal ensued.

In his first and second issues, appellant complains the evidence is legally and factually insufficient to support his conviction. When reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jack-*

son v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Chambers v. State, 866 S.W.2d 9, 15 (Tex.Crim.App. 1993). In this review, the trier of fact is the exclusive judge of the weight and credibility given to witness testimony. See Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim.App.1996).

In a factual sufficiency review, we ask "whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." King v. State, 29 S.W.3d 556, 563 (Tex. Crim.App.2000). We will reverse the fact finder's determination only if a manifest injustice occurred. Id. In conducting this analysis, we may disagree with the jury's determination, even if probative evidence supports the verdict, but we must avoid substituting our judgment for that of the fact finder. See Johnson v. State, 23 S.W.3d 1, 6 (Tex.Crim.App.2000).

Appellant argues the evidence is legally and factually insufficient to establish that he was the person who fired the shot that killed Lopez. Essentially, he contends someone else could have shot Lopez, and there is no scientific evidence to prove he did it. He argues (1) Lopez could have been shot with "practically any caliber handgun," (2) several shell casings were found in the neighborhood, (3) one other person was seen in the neighborhood that night with a gun, and (4) shots were fired in the neighborhood that night by someone other than appellant.

■ We acknowledge that a bullet was not recovered from Lopez's body and, therefore, no scientific evidence established the caliber that hit him. Likewise, we acknowledge that several live and spent shell casings were found in the neighbor-

hood that night and that another person was seen with a gun. However, the evidence at trial showed appellant, not anyone else, shot at Lopez.

First, Ayala witnessed the shooting from across the street. He saw appellant fire his gun and saw the flash. Ayala jumped to the ground and when he looked up, Lopez was on the ground and appellant was walking away. Ayala ran to Lopez and saw he had been shot. Although appellant argues Ayala did not "see a cause and effect between a shot ... and Lopez's death," we conclude a rational jury could reasonably find that Lopez fell as a result of a bullet from appellant's gun hitting him.

Second, appellant's friend, Nunez, was with him when he shot the gun. Nunez told the police on the night of the shooting that appellant shot Lopez. Although Nunez testified differently at trial, it was left to the jury to determine which version it believed: what the police said Nunez told them that night or Nunez's testimony at trial. Certainly, the jury could consider the fact that Nunez was a long-time friend of appellant's and would not want to appear to be a "snitch."

Finally, appellant himself acknowledged in his statement to police that he fired his gun in the direction of Lopez as Lopez ran away. Appellant ignores this evidence in arguing the legal and factual sufficiency of the evidence and instead relies on Nunez's trial testimony that appellant fired twice in the air. Again, however, this was a determination for the jury to make. Having reviewed the evidence under the appropriate standards of review, a rational jury could conclude, beyond a reasonable doubt, that appellant shot Lopez. Moreover, this evidence is not so weak, nor is it greatly outweighed by other proof, so as to constitute a manifest injustice.

■ We note that appellant also makes a conclusory alternative argument that even if the State proved that he shot Lopez, the State failed to prove he intentionally or knowingly caused Lopez's death or intended to cause Lopez's death. He asserts, without reference to any legal citation or analysis, that the most the State established was that he acted recklessly. For a legal sufficiency issue, the evidence that will most likely be argued as supporting the element must be discussed and analyzed in accordance with relevant case law and our standard of review. *See Turner v. State,* 4 S.W.3d 74, 81 (Tex.App.-Waco 1999, no pet.). In a factual sufficiency challenge, a summary of the relevant testimony or other evidence relevant to the specific element being challenged, along with appropriate citations to authorities and the record, should be contained in the brief with an analysis of the standard of review. *Id.* This issue does not meet these requirements; accordingly, it is inadequately briefed and presents nothing for review. *See* Tex.R.App. P. 38.1(h).

■ Regardless, having reviewed the record in this case, we conclude the evidence is legally and factually sufficient to show, at a minimum, that appellant intended to cause Lopez serious bodily injury and committed an act clearly dangerous to human life—an alternative theory alleged by the State on which the jury could have convicted appellant. The evidence shows that appellant was angered that Lopez cursed at him and told Hernandez, "I don't want you. I want your friend, Freddy." Nunez tried to calm appellant down, warning, "Don't do it." Nevertheless, appellant shot Lopez in the back as he ran away. The first and second issues are without merit.

In his third issue, appellant complains the trial court abused its discretion in not holding a hearing on his amended motion for new trial. He argues the motion raised a claim not determinable from the record, ineffective assistance of counsel, and the trial court was therefore required to hold a hearing on the motion. He asks that we abate the appeal so that a hearing can be conducted on the motion.

■■ A trial court is not required to convene a hearing on a motion for new trial absent a request by the movant for such a hearing. *Brooks v. State,* 894 S.W.2d 843, 847 (Tex.App.-Tyler 1995, no pet.); *see Edwards v. State,* 37 S.W.3d 511, 515 (Tex.App.-Texarkana 2001, pet. ref'd). There is nothing in the record to suggest that appellant wanted or requested a hearing on his motion. In fact, the motion itself makes no request for a hearing and simply seeks a new trial. Because appellant did not request a hearing, the trial court could not have abused its discretion in failing to hold one. We conclude the third issue is without merit.

In his fourth issue, appellant contends the jury charge, which contained an instruction on good conduct time, violated his due process rights. He argues that although the instruction is mandated by article 37.07, section 4(a), the charge is erroneous because he is not eligible for mandatory supervision and thus the instruction does not apply to him. He argues the erroneous charge violated his due process rights. The Texas Court of Criminal Appeals recently addressed this same issue involving a similar charge and similar arguments and concluded the appellant's due process rights were not violated. *See Luquis v. State,* 72 S.W.3d 355, 366 (Tex. Crim.App.2002).

■ As in *Luquis,* nothing in the record suggests jurors discussed, considered, or tried to apply what they were told about good conduct time and parole, nor was the issue discussed in argument. The jury did

not send out any notes indicating or expressing confusion about the possible application of good conduct in this case. Although appellant could have received life in prison, the jury gave him fifty years. We conclude, as did the court in *Luquis,* that appellant "has failed to shoulder his burden to demonstrate that there is a reasonable likelihood that this jury unconstitutionally misapplied the concept of 'good conduct time' to assess a higher sentence as a result of the instruction, thereby denying appellant due course of law." *See id.* We conclude the fourth issue is without merit.

We affirm the trial court's judgment.